UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DAVID WILLIAMS,<br><br>　　　　　　　Petitioner,<br><br>　v.<br><br>JOE SCHMIDT,<br><br>　　　　　　　Respondent. | 3:10-CV-00025-TMB-DMS<br><br>**INITIAL REPORT AND RECOMMENDATION REGARDING RESPONDENT'S MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS FILED AFTER THE STATUTE OF LIMITATIONS EXPIRED**<br>**[Doc. 36]** |

## I. BACKGROUND AND MOTION PRESENTED

In March of 1990, Petitioner Williams was convicted of first-degree murder for killing his girlfriend, Deborah Goodlataw. He filed a direct appeal, but his appeal was denied and his conviction upheld. *See Williams v. State*, 823 P.2d 1 (Alaska App. 1991). He then sought review from the Alaska Supreme Court, but on January 31, 1992, the Alaska Supreme Court denied his request. (Doc. 36-5). On June 27, 1996, Petitioner Williams filed an application for post-conviction relief in state court. The trial court dismissed the petition, and Williams appealed. The Alaska Court of Appeals affirmed that dismissal. *Williams v. State*, No. A-9603, 2008 WL 901195 (Alaska App. April 2, 2008) (unpublished). Again, Williams asked the Alaska Supreme Court to review the decision, but his request was denied on January 29, 2009. (Doc. 36-9).

On February 8, 2010 this Court received a habeas corpus petition pursuant to 28 U.S.C. § 2254 from Petitioner Williams (Doc. 1). The petition is very basic because, as Williams informed the Court in his petition, he recently had been moved from a prison in Arizona to a prison in Colorado and had not been able to locate his legal paperwork. The petition puts forth

two claims for relief: 1) his trial counsel was ineffective; and 2) his statements to police were involuntary because one of the interrogating officers pretended to be an Alcoholics Anonymous member. He signed the petition on January 29, 2010.

He was appointed an attorney in this matter. (Doc. 6). The attorney, Ms. Averil Lerman with the Federal Public Defender, was given until April 15, 2010 to file an amended petition. Ms. Lerman filed a preliminary supplement to the original petition. (Doc. 10). In that supplement, Ms. Lerman puts forth three more claims for relief: 1) insufficient evidence; 2) actual innocence; and 3) his statements were involuntary because of his cognitive, developmental, and organic brain disabilities, in addition to the fact that one of the officers interrogating him was actually his Alcoholics Anonymous sponsor. She informed the Court that she needed to conduct more research and that she would then file a formal amended petition. She has since received extensions of time to file the amended petition.

In the meantime, Respondent filed this motion to dismiss, arguing that, under 28 U.S.C. § 2244(d), Williams missed the one-year filing deadline for any federal habeas corpus petition after calculating the amount of time that was statutorily tolled because of a pending state post-conviction relief application. Petitioner filed a response in opposition at Docket 55. In that response, Petitioner does not dispute that he missed the filing deadline, but he asserts that the deadline should be equitably tolled and he should be allowed to continue with his petition. He argues that equitable tolling is appropriate because he suffers from mental disabilities that prevented him from timely filing his petition and he was otherwise reasonably diligent in attempting to file a petition given his disabilities, citing to *Bills v. Clark*, 628 F.3d 1092 (9th Cir. 2010). Williams submitted 16 exhibits in support of his argument that equitable tolling is

appropriate in this case.

In a separate filing at Docket 56, Williams asked for an evidentiary hearing. That motion will be ruled on in a separate order. All other deadlines in this case have been stayed pending the outcome of this motion. (Doc. 45).

Respondent filed a reply at Docket 63, arguing that Williams has not demonstrated that he has a severe mental impairment or that he was otherwise diligent in pursuing his petition. It argues that an evidentiary hearing is not needed because there is no basis to his claim for equitable tolling.

## II.  APPLICABLE LAW

### A. Statute of limitation for 28 U.S.C. § 2254 petitions

Effective April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA placed a one-year statute of limitations for state prisoners filing federal habeas corpus petitions. 28 U.S.C. § 2244(d)(1). The one-year limitation period applies to all petitions for habeas corpus relief filed in federal court after the AEDPA's effective date of April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Typically, for a case concluding after the enactment of AEDPA, the limitation period begins on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

The conviction in this case, however, became final in 1992, before the enactment of AEDPA. In such cases, the one-year limitations period began running on April 25, 1996, the day after AEDPA's effective date. *Patterson v. Stewart*, 251 F.3d 1243, 1245 (9th Cir. 2001). That means that for a petitioner whose conviction was final prior to April 24, 1996, the time for filing

a federal habeas petition would have expired on the one-year anniversary of AEDPA unless some type of tolling factors into the calculation.

The statute specifically authorizes tolling of the deadline during any period of time when a properly filed application for post-conviction relief is pending in state court. 28 U.S.C. 2244(d)(2). In this case, Williams filed a petition for post-conviction relief in state court on June 27, 1996.[1] That petition was pending in the state court until January 29, 2009 when the Alaska Supreme Court denied Williams' request for review of the dismissal. Thus, the limitations clock began running again on January 30, 2009. Thus, the time between June 27, 1996 and January 29, 2009 is excluded from the one-year statute of limitations. In other words, the time from April 25, 1996 to June 26, 1996 and everyday after January 30, 2009 count against his one-year deadline.

Based on its own calculations, 63 days of the one-year limitation period ran before Williams tolled the deadline by filing his state post-conviction relief application (April 25, 1996 to June 26, 1996). Then the limitation began running again on January 30, 2009. On that date, because 63 days had already passed on the one-year limitation deadline, Williams had 302 days to file his petition with this Court (365 days - 63 days = 302 days). Therefore, this Court concludes that the limitation period expired on November 27, 2009, 302 days after the Alaska Supreme Court denied his request for a hearing and ended his post-conviction relief process in state court.

Williams, however, did not file the petition until January 29, 2010.[2] That is a little more

---

[1] Respondent states that the petition was filed on June 26, 1996 but based on this Court's review of the petition found at Docket 36-6, the application was dated June 27, 1996.

[2] The date Williams signed and delivered the petition to the prison system for filing constitutes the filing date of the petition. *See Houston v. Lack*, 487 U.S. 266, 275-76 (1988).

than two months after his deadline expired. Indeed, Williams does not contest that he missed the statutory deadline. He argues that he should be allowed to proceed because equitable tolling can be applied to excuse the two-month delay.

## B. Equitable tolling

The statute of limitations in § 2244(d)(1) is subject to equitable tolling in appropriate circumstances. *Holland v. Florida*, 130 S.Ct. 2549, 2560 (2010) (noting that the AEDPA statute of limitations defense is not jurisdictional and the statute does not set forth an inflexible rule requiring dismissal whenever its clock has run). To qualify for equitable tolling, the petitioner must show (1) that he has been pursing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing. *Holland*, 130 S.Ct at 2562-63; *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005). Equitable tolling is not warranted unless "external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim." *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999). However, the diligence required is reasonable, not maximum, diligence. *Holland*, 130 S.Ct. at 2565.

The petitioner bears the burden of demonstrating that the standards for equitable tolling have been met. Indeed, it is a very high standard, as equitable tolling is justified in few cases. *See Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003) (stating that the threshold to trigger equitable tolling is very high). But, as the Court noted in *Holland*,

> The flexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention. . . . [C]ourts of equity can and do draw upon decisions made in other similar cases for guidance. Such courts exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in appropriate cases.

*Id.* at 2563 (internal quotations omitted). Thus, whether equitable tolling is warranted is highly

fact dependent and should be determined on a case-by-case basis. *Spitsyn*, 345 F.3d at 799; *Lott v. Mueller*, 304 F.3d 918, 923 (9th Cir. 2002).

**C. Mental impairment as a grounds for equitable tolling**

Mental illness or disability can, in some circumstances, constitute an extraordinary circumstance beyond a petitioner's control that would be sufficient to provide a basis for equitable tolling. The mental disability must, however, have made it impossible to comply with the filing deadline given the particular circumstances present during the limitations period. The courts do not have to apply the term "impossible" literally. Equitable tolling is still appropriate in cases where it would have technically been possible for a prisoner to file a petition on time but the prisoner would likely have been unable to do so. *Bills v. Clark*, 628 F.3d 1092, 1100 n.3 (9th Cir. 2010). In *Bills*, the Ninth Circuit set forth a two-part test courts should use to determine eligibility for equitable tolling based on mental impairment:

> (1) First, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, . . . by demonstrating the impairment was so severe that either (a) petitioner was unable rationally or factually to personally understand the need to timely file, or (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing. . . .
> (2) Second, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

*Bills*, 628 F.3d at 1099-100 (internal citations and quotations omitted). The Ninth Circuit went on to explain further:

> [T]he "extraordinary circumstance" of mental impairment can cause an untimely habeas petition at different stages in the process of filing by preventing petitioner from understanding the need to file, effectuating a filing on his own, or finding and utilizing assistance to file. The "totality of the circumstances" inquiry in the second prong considers whether the petitioner's impairment was a but-for cause of

> any delay. Thus, a petitioner's mental impairment might justify equitable tolling if it interferes with the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure. The petitioner therefore always remains accountable for diligence in pursuing his or her rights. . . . [T]he petitioner must diligently seek assistance and exploit whatever assistance is reasonably available.

*Id.* at 1100-01.

Williams submitted sixteen exhibits in an effort to demonstrate that he has a severe mental impairment that made him unable to understand the need to timely file and that made him unable to personally prepare the petition, as well as to demonstrate that he was adequately diligent in his efforts to file a petition given his mental impairments and the assistance available to him.

### III. EVIDENCE SUBMITTED

#### A. Williams' Mental Impairment

Williams introduced the testimony of Dr. James P. Sullivan, a forensic neuropsychologist, who examined Williams for a period of ten hours in 2002, as evidence to support his request for equitable tolling. Dr. Sullivan's findings were presented during a hearing in Williams' state post-conviction relief case and Williams included Dr. Sullivan's testimony with his filings in this motion. (Ex. 3)[3].

Dr. Sullivan concluded that Williams suffered from "organic impairment or brain damage." (Ex. 3 at p. 33). He based his conclusion on the fact that Williams scored a .7 on the Halstead-Reitan Neuropsychological battery index. (Ex. 3 at p. 33). That index measures whether a person has brain damage. A person scoring a 0 on the index would not have any brain

---

[3] Williams' exhibits are filed at Docket 53.

damage.  A person scoring .5 is considered impaired and a person scoring 1.0 is extremely impaired.  (Ex. 3 at pp. 32-33).  Williams' score of .7 was clear indication to Dr. Sullivan that Williams suffers from some type of brain damage.  He speculated that the brain damage could have resulted from a variety of factors, including documented abuse as a child, chronic alcoholism as an adult, and head injuries suffered in accidents and fights.  (Ex. 3 at pp. 35-39).

Dr. Sullivan also concluded that Williams' overall IQ was 78, which placed him in the bottom seventh percentile.  (Ex. 3 at pp. 28-29).  Dr. Sullivan testified that his IQ placed him in the "borderline" range of extreme impairment, as extreme impairment is found with an IQ of 70 or below.  (Ex. 3 at pp. 28).  He explained that experts no longer use the term mentally retarded and instead use the term extremely impaired.  (Ex. 3 at pp. 28).  He broke down Williams' IQ score even further, explaining that an overall IQ score is made up of a verbal IQ score and a performance IQ score.  Whereas verbal IQ deals with verbal function, performance IQ deals with spacial and visual function.  (Ex. 3 at pp. 26-28).  Williams' verbal IQ score was 73, again in the borderline range, very close to extreme impairment.  (Ex. 3 at pp. 27).  A score of 73 means that Williams is in the bottom fourth percentile when it comes to verbal processing. His performance IQ of 89, however, was in the low-average range.  Dr. Sullivan also tested Williams for memory function.  Again, he found that Williams scored lower with verbal memory function than with visual memory function.

Dr. Sullivan also testified that he accounted for people who malinger or try to fail the tests.  He used certain measures during his testing that are specifically designed to detect deception.  He concluded that Williams was not malingering or engaging in deception during the tests. (Ex. 3 at pp. 35).

Dr. Sullivan's exam of Williams was in 2002 but the period of time the Court must consider in its analysis is the limitations period. In this case, much of the limitations period ran after January 29, 2009. In order to demonstrate that the impairment existed not only in 2002 but was permanent, Williams subjected himself to another round of clinical evaluations in April of 2011 with Dr. Paul Richards, a qualified clinical neuropsychologist. (Ex. 11).

Dr. Richards' findings and report were filed in support of Williams' opposition to this motion to dismiss. (Ex. 12). His overall IQ score based on the based on the Wechsler Adult Intelligence Scale- IV calculated from Dr. Richards' tests was 82, which is slightly higher than the score of 78 calculated from Dr. Sullivan's test. (Ex. 12 at p. 5). That score of 82 placed him in the bottom twelfth percentile. (Ex. 12 at p.5). Williams' performance/perceptual reasoning IQ scores were average, but his verbal IQ score was 70, placing him in the bottom second percentile. (Ex. 12 at p. 5). Dr. Richards' examination also concluded that his working memory IQ was 74, which placed him in the bottom fourth percentile. (Ex. 12 at p. 5). Dr. Richards' conclusion was thus consistent with Dr. Sullivan's conclusion in regards to Williams' verbal IQ.

Dr. Richard presented further evidence about Williams' verbal skills based on other subtests performed. He found that Williams' ability to solve word finding problems was in the bottom 3rd percentile and his ability to define a range of words was in the bottom 5th percentile. (Ex. 12 at p. 7).

Dr. Richards ran a variety of intelligence and performance tests and subtests on Williams to further identify any mental impairments. He found that Williams' learning abilities were mildly impaired with verbal learning deficits noted. (Ex. 12 at 8). He found that Williams' memory functions were impaired based on a variety of tests. His ability to answer questions

about certain learning materials was impaired (falling in the second percentile). (Ex. 12 at 9). His immediate recall was severely impaired and his long term recall function was moderately impaired. (Ex. 12 at p. 9). Dr. Richards also found that Williams was impaired in his ability to implement strategy and problem solve. For example, Williams' ability to solve problems that required abstraction was in the bottom fifth percentile. (Ex. 12 at p.10). As Dr. Richards noted, after having Williams perform some of the abstraction tests, Williams implemented poor strategies and was incapable of completing the tasks with appropriate reasoning. (Ex. 12 at 10).

     As with Dr. Sullivan, Dr. Richards concluded that Williams did not exaggerate the results based on embedded effort and consistency measures that are a part of the various tests. Thus, he concluded that the results are valid and reliable. (Ex. 12 at p. 5).

     Based on all these tests and results, Dr. Richards concluded that Williams has significant brain damage that affects his verbal functioning. (Ex. 12 at p. 12). He states that these findings are consistent with Dr. Sullivan's findings from 2002 that Williams suffered impairments of processing verbal material, working memory, and overall neuropsychological functioning. (Ex. 12 at p. 12). Because his results were consistent with Dr. Sullivan's results, he concluded that Williams' brain damage and resulting verbal functioning impairment is permanent and was present in the time span when he need to complete his legal paperwork. (Ex. 12 at p. 12). He stated Williams' brain damage was likely a result of many factors, including multiple traumatic brain injuries shown in his medial records, his chronic alcoholism, and severe childhood abuse. (Ex. 12 at pp. 12-13).

     He also concluded that Williams' impairments are such that he likely would not be able to file a habeas petition:

> The effects of Mr. Williams' brain damage that has resulted in multiple neuropsychological deficits (particularly severely impaired verbal short term memory) are such that he likely would have been unable to initiate, complete, and file the petition for writ of habeas corpus within the required time period.

(Ex. 12 at p. 13). He bases this conclusion on planning and recall impairments and his verbal functioning impairments:

> Specifically, the past and present neuropsychological test results indicate that his cognitive deficits are in areas mediating the ability to plan, organize and problem solve as well as attend/concentrate and recall important information needed on the petition. Moreover, I do not believe Mr. Williams has the verbal comprehension (2nd percentile-impaired) or reading comprehension (7th grade level) to independently understand many of the words or concepts in the 16-page "petition for relief..." that I had occasion to review.

(Ex. 12 at p. 13). He emphasized that it is not any one deficit but the totality of deficits that he believes combine to make it impossible for Williams to have "understood, correctly completed and filed this petition." (Ex. 12 at p.13).

A review of the Alaska Department of Corrections medical records for Williams also indicates that Williams is considered borderline on the intelligence scale, with an IQ of 70. (Ex. 1-F at p. 1). A probation officer's report from 1978 also states that Williams was very poor in skills "that are most related to required information." (Ex. 1-E at p. 5).

Indeed, counsel for Williams submitted Williams' own affidavit in support of his equitable tolling request, in which Williams asserted that although he wanted to file a petition, he did not know how to go about doing so. (Ex. 5 at ¶ 3). He asserted that he does not understand legal words and couldn't file the petition himself. (Ex. 5 at ¶ 3). Williams' counsel also submitted the affidavit of Sean Wright, a fellow prisoner housed with Williams after Williams moved to the Colorado facility in December of 2009. (Ex. 6). Wright stated that he thought

11

Williams did not understand what a habeas petition was and that it was "pretty clear" Williams would have been unable to file a habeas petition himself. (Ex. 6 at ¶¶ 6, 9, 10). Wright was the person who wrote and filed the petition for Williams, free of charge. (Ex. 6 at ¶8).

Other immates filed affidavits in support of Williams' motion. These inmates asserted that Williams is reclusive and stays inside his cell playing video games most of the time. They asserted he does not interact with others very much. (Ex. 7 at ¶ 8, Ex 8 at ¶¶ 4, 5; Ex. 9 at ¶6). One inmate, Edward Lowry, said that Williams is not good at talking to other people and has a hard time putting things into words. (Ex. 9 at ¶6). That sentiment is confirmed by another inmate, Arthur L. Thomas who said that Williams is not good at talking to people or asking others for help. (Ex. 7 at ¶ 11). He also said that Williams gets "extremely discouraged by the obstacles [in prison]." (Ex. 7 at ¶11 ). Wright also indicated that Williams does not get along with other people and is not good at asking other people for help. He indicated that people try to take advantage of Williams in prison. (Ex. 6 at ¶11).

## B. Williams' Diligence

As noted above, Williams' counsel submitted a variety of affidavits in support of Williams' request for equitable tolling. These affidavits were submitted to demonstrate the efforts he took to file a habeas petition, the obstacles in his way, the availability of assistance, and the circumstances during the time period when his habeas deadline was approaching.

In his own affidavit, Williams explained that he asked other inmates about filing a habeas corpus petition. They indicated that they would help him for a fee that was more than Williams could afford to pay. Another inmate, Timothy St. Clair, confirmed in his affidavit that other inmates help prepare habeas petitions but at a cost that is often prohibitive. St. Clair indicated

that he has not been able to use the assistance of other inmates because of the cost. (Ex. 8 at ¶ 6). As noted above, other inmates also indicated that Williams is a very reclusive person. They asserted he does not interact with others very much. (Ex. 7 at ¶ 8, Ex 8 at ¶ ¶ 4, 5; Ex. 9 at ¶6).

The inmates' affidavits also described the circumstances taking place in the prison between November 2009 and January 2010 —the time period in which the deadline was approaching and in which Williams filed his petition. At the end of 2009 prisoners at an Arizona correctional facility were moved to a new correctional facility in Colorado. Some prisoners were moved at the end of November, 2009. (Ex. 7 at ¶2). Williams was moved on December 6, 2009. (Ex. 5 at ¶4).

There were disruptions prior to the move. Williams indicated that his legal files and personal property were boxed up about a week before his move, which would have been about the time the petition was due. (Ex. 5 at ¶6). Access to the law library was also restricted prior to the move. Lowry, an inmate with Williams who worked in the law library, indicated that there was disorganization for a month preceding the move to the Colorado facility. (Ex. 9 at ¶4). Inmate Thomas also noted there were problems before the move to Colorado began: "Before the move, there was a lot of disruption. Prisoners had to pack all their property for some time prior to the move. Prisoners were locked down for some time prior to the move, and could not engage in [their] usual activities. There was no access to the law library during this time." (Ex. 7 at ¶ 5). Williams and another inmate, Raymond Schuenemann, also noted that inmates could not use the law library in the Arizona facility prior to the move. (Ex. 10 at ¶3; Ex. 5 at ¶ 8).

There were also disruptions after the move. Many of the inmates who submitted an affidavit indicated that it took several weeks to a couple months after they were moved to

Colorado to retrieve their property and legal files. (Ex 6 at ¶ 4; Ex. 7 at ¶ 3; Ex. 10 at ¶ 5). Lowry recalled that "some inmates did not get their property . . . for months after we got to Hudson. To get it, you had to be on top of the issue on almost a daily basis, going down and being assertive about getting it." (Ex. 9 at ¶ 5). The law library in the Colorado facility was not functional at the time the inmates arrived. (Ex. 7 at ¶ 4; Ex. 5 at ¶ 7). According to Wright, the library was not accessible until late January of 2010. (Ex. 7 at ¶ 4). When the library did finally open, it did not have legal forms or books. (Ex. 6 at ¶ 5; Ex 5 at ¶ 9).

Williams indicated in his affidavit that when he moved to the Colorado facility, he talked to Wright. Wright had not been at the Arizona facility with Williams. (Ex. 6 at ¶ 2). The two talked about their cases. Wright said he realized that Williams would not be able to file a habeas petition by himself. (Ex. 6 at ¶ 6). Wright offered to help Williams at no cost. (Ex. 6 at ¶ 8). Williams accepted the offer and filed what Wright wrote. (Ex. 6 at ¶ 9).

In his pro se application filed at Docket 1, Williams, through Wright, indicated that he filed the petition without the benefit of his legal paperwork. He explained that he has been unable to locate his paperwork since arriving in Colorado on December 6, 2009.

## IV. ANALYSIS

### A. Was Williams' mental impairment an "extraordinary circumstance?"

This Court has closely reviewed the exhibits presented by Williams in his opposition to Respondent's motion to dismiss and his request for equitable tolling. It is clear that Williams has shown he has a mental impairment. Based on the first prong of the test set forth in *Bills*, this court must consider whether Williams' impairment is severe enough to constitute an extraordinary circumstances warranting the application of the Court's equitable powers. To be a

severe impairment, Williams has to show that he was unable to personally understand the need to timely file the habeas petition or that his mental state rendered him unable to personally prepare a habeas petition and effectuate its filing.

After due consideration, this Court finds that Williams has demonstrated that his impairment was severe.  The records submitted, including the testimony of Dr. Sullivan and the report by Dr. Richards, confirm that Williams has brain damage that is permanent.  The brain damage existed during the time the statute of limitations was running in this case.  Without repeating all of the findings of the psychologists detailed above, the brain damage affects his verbal functioning, his verbal short-term and long-term memory, and overall cognitive functioning.  His overall intelligence is low, ranging from the bottom fourth percentile (Dr. Sullivan's findings) to the bottom twelfth percentile (Dr. Richard's findings).  But drilling down into the data further, it is clear that his verbal intelligence is even lower, suggesting that his higher overall IQ scores are attributable to his spacial and visual skills, which are not impaired, but are not clearly related to his ability to complete and file a habeas petition.  Indeed, he is in the bottom second percentile of adults his age in verbal comprehension and in the lower fourth percentile in working memory.  He is impaired in his ability to remember and define verbal information.  (Ex. 12 at p. 7).  Also, based on Dr. Richards' findings, Williams' brain damage also affects his ability to plan, organize, and problem solve. His ability to solve problems that involve any level of abstraction, such as identifying a common feature of two words, was only in the 5th percentile.  (Ex. 12 at p. 9).  Those clinical findings are confirmed informally by other inmates who assert that Williams gets discouraged by obstacles, has a hard time putting things into words, and is not assertive.

Such verbal and recall impairments would have made Williams unable to personally prepare his habeas petition and effectuate its filing. Williams' affidavit asserts he did not know how to go about filing and was unable to do it himself. Wright, the person eventually responsible for getting Williams' petition to the Court, stated that it was obvious from his conversation with Williams that he would not have been able to file a habeas petition on his own.

Therefore, this Court concludes that Williams has demonstrated that his mental impairments are severe based on *Bills* because (1) he was unable to understand the need to timely file the petition and (2) because he was unable to personally prepare a habeas petition and effectuate its filing. Under *Bills*, only one of these two situations must be demonstrated to show a severe impairment. Williams showed both. Respondent asserts that Williams failed to assert himself that he did not understand the need to timely file the petition. But based on the record, it is clear that Williams' recall and verbal deficits would make Williams unable to remember and understand what had to be done to continue his case and when. Furthermore, as stated above, even if he were to have understood that he was under a deadline, this Court also finds he was unable to personally prepare and effectuate the filing of a habeas petition, which alone would be enough to satisfy the first part of the *Bills* test.

**B. Did Williams demonstrate sufficient diligence given his impairment and circumstances?**

Based on the Ninth Circuit precedent in *Bills*, having a severe impairment itself does not warrant equitable tolling. The petitioner must also show diligence in pursuing the petition to the extent he could understand but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance. The Court must consider whether Williams' impairments prevented him from

16

locating assistance or communicating with or sufficiently supervising any assistance found.

After consideration of the record in total, this Court concludes that Williams has also met the diligence prong of the *Bills* test. As the Supreme Court noted in *Holland*, the diligence requirement is not maximum diligence but rather reasonable diligence. In this situation, we must examine whether, given Williams' impairments, he was sufficiently diligent.

Williams' affidavit provides evidence of his attempt to get assistance. He notes that he tried to get inmates to help him while he was housed in the Arizona facility. There were inmates available to help, but at a cost. Williams asserts that the costs were prohibitive. An affidavit from another inmate, Timothy St. Clair, confirms that it is expensive to get other inmates to help file a petition and that the cost has prevented him from using other inmates' assistance. (Ex. 8 at ¶ 6).

This Court concludes that Williams was unable to do much more, given his mental impairments. His impairments hindered his ability to seek help from others and oversee that help. Dr. Richards' report supports a finding that Williams has a difficult time implementing a strategy or plan. This would make it difficult for him to seek help to meet a deadline even if he were to understand the deadline in the first place and difficult for him to repeatedly ask for help and follow up with leads on assistance. Indeed, the informal statements of other inmates supports a finding that Williams had a difficult time asking others for help, putting thoughts into words, and navigating the obstacles in prison. He was not assertive and other inmates try to take advantage of him, which likely causes Williams to withdraw more. Furthermore, his mental impairments related to verbal functioning, recall, and problem solving likely exacerbate Williams' reclusiveness and his difficulties in asking for help.

This Court also notes that while Williams may not have used the law library, the evidence makes it clear that Williams would not have been able to conduct research and understand forms in order to file a petition. Indeed, Williams did not proceed pro se in any of his state court proceedings and there is nothing to suggest that Williams can handle filing paperwork or navigating the legal system himself. Furthermore, the Arizona library was closed to inmates prior to the relocation of inmates to Colorado, which began in November. Therefore, the library would not have been accessible to Williams around the time his petition was due.

Furthermore, the record shows that after Williams was moved, he was unable to access his legal paperwork. He was also unable to access a law library until late January. Respondent argues that the circumstances present in the prison system after the filing deadline of November 27, 2009 are not relevant. It is true that anything that happened after the filing deadline did not present an obstacle for Williams in terms of meeting a deadline. However, these circumstances show that when Williams was able to find free assistance through Wright, he quickly took advantage of that help even though there were still some serious obstacles related filing legal paperwork because of the recent move. It helps show that Williams was diligent with the appropriate help. Wright was not housed in the Arizona facility, so Williams was not able to meet with him prior to moving to Colorado.

Given the totality of the circumstances and Williams' mental deficiencies, this Court concludes that Williams was reasonably diligent in filing his petition. Equity is not offended by allowing the Williams' petition to move forward.

## V. CONCLUSION

Based on the foregoing, this Court respectfully recommends that Respondent Schmidt's Motion to Dimiss Petition for Writ of Habeas Corpus Filed After the Statue of Limitations Expired be DENIED and that Petitioner Williams be able to proceed with the filing of an amended petition.

DATED this 13th day of September, 2011, at Anchorage, Alaska.

/s/ Deborah M. Smith
DEBORAH M. SMITH
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **CLOSE OF BUSINESS, September 16, 2011.**  Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-89 (9th Cir. 1980), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.  United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, September 21, 2011.**  The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).  **D.AK.L.M.R. 6(a) authorizes the court to alter the standard objection deadlines.**

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).